UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NOS.  3:07-cr-289-JCH-1 |
| | 3:08-cr-233-JCH-1 |
| v. | |
| ISNI GJURAJ | January 22, 2021 |

**GOVERNMENT'S MEMORANDUM IN AID OF RESENTENCING
AND IN OPPOSITION TO DEFENDANT'S MOTION FOR
SENTENCE REDUCTION UNDER 18 U.S.C. § 3582(c)(1)(A)(i)**

The Government submits this memorandum in aid of the defendant Isni Gjuraj's February 2, 2021 resentencing, and in opposition to his December 18, 2020 motion for a reduced sentence under 18 U.S.C. § 3582(c)(1)(A)(i) [Dkt. #1179, hereinafter "§ 3582 Motion"].[1]   This defendant plotted to murder four witnesses, one of whom was left permanently disfigured as a result; led a massive narcotics trafficking organization; trafficked in firearms; and robbed a woman at gunpoint. While the First Step Act and compassionate release statute do important work in reducing terms of incarceration for certain deserving offenders, they should not be used to free—or even reduce the sentence of—a man who committed himself to terrorizing others and to poisoning a Norwalk neighborhood.   Judge Kravitz carefully weighed the statutory factors to arrive at a 320-month sentence, and nothing has changed to upset his analysis.   The Court should decline to resentence Gjuraj and deny his motion.

**I.      PROCEDURAL BACKGROUND**

**A.      The Charges**

In March 12, 2008, a federal grand jury returned a 30-count Second Superseding Indictment charging Gjuraj and 22 other individuals with various narcotics trafficking, firearm and witness tampering offenses related to the distribution of cocaine and crack cocaine in Fairfield

---

[1]  All docket references are to case number 3:07-cr-289, unless otherwise noted.

County.   Specifically, Gjuraj was charged with:

- tampering with a witness (under 18 U.S.C. §§ 1512(a)(1) and 1512(a)(1)(3)(B));

- retaliation against a witness (under 18 U.S.C. §§ 1513(a)(1)(B) and 1513(a)(2)(B));

- use of a firearm in relation to a crime of violence (under 18 U.S.C. §§ 924(c)(1)(A)(I) and 924(c)(1)(A)(iii));

- conspiracy to distribute and to possess with intent to distribute 50 grams or more of cocaine base (under 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A)(iii));

- conspiracy to distribute and to possess with intent to distribute five kilograms or more of cocaine (under 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii) and 846); and

- three counts of possession with intent to distribute 50 grams or more of cocaine base (under 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(iii), and 18 U.S.C. § 2).

### B.      The Plea Hearing

On November 14, 2008, the defendant pled guilty to: (i) Count Two of the Second Superseding Indictment, charging retaliation against a witness; (ii) Count Four of the Second Superseding Indictment, charging conspiracy to possess with intent to distribute 50 grams or more of cocaine base; and (iii) Count One of an Information, charging a Hobbs Act Robbery under 18 U.S.C. § 1951.   As part of the plea agreement, the parties stipulated that the defendant's total offense level was 41 and that he fell within Criminal History Category I, thus carrying a range of imprisonment of 324 to 405 months subject to a mandatory minimum term of imprisonment of 120 months.   Gjuraj also agreed to forfeit $3696 and three cars (the BMW 745, Acura, and Jeep Grand Cherokee discussed below).

The defendant stipulated to the following offense conduct regarding Counts Two and Four:

> From in or about January 2007 to in or about February 2008, the defendant agreed with others named and not named in the Second Superseding Indictment to knowingly and intentionally distribute 50 grams or more of a mixture and substance containing a detectable amount of cocaine base.   The defendant acknowledges and

> stipulates that his conduct as a member of the narcotics conspiracy charged in Count Four, which includes the readily foreseeable conduct of other members of that conspiracy, involved at least 4.5 kilograms of a mixture and substance containing a detectable amount of cocaine base[.]
>
> Moreover, on December 24, 2007, defendant Gjuraj attempted to murder, or aided, abetted, induced or procured others named in the Second Superseding Indictment, to attempt to murder another individual with the intent to retaliate against that person for providing information to a law enforcement officer relating to the commission or possible commission of a narcotics trafficking offense.   Defendant Gjuraj also procured a firearm for use in the commission of the offense with the intent and knowledge that it would be used to murder, or to attempt to murder, the victim.   A firearm was discharged during the course of the offense and the victim sustained serious bodily injury.

Plea Agreement [Dkt. #425] at 12.

During the plea colloquy, the Court asked the defendant to state in his own words what he did that made him guilty of Count Two.   Change of Plea Tr. [Dkt. #731] at 48-49.   The defendant replied, "I, along with others, conspired to retaliate against a person for providing information against me."   *Id.* at 49.   When the Court asked what the defendant meant by "conspired to retaliate," the defendant explained, "I paid somebody to do something, to shoot somebody."   *Id.*   The Court inquired, "So you paid another person to murder or attempt to murder another person?"   *Id.*   The defendant responded, "Yes."   *Id.*   The Court then asked, "And you did that because you thought that that person had, was, cooperating with law enforcement?"   *Id.*   Again, the defendant responded, "Yes."   *Id.*

The Court then asked the government to explain what evidence it would present to prove Count Two.   The government replied, in relevant part:

> With respect to Count Two, which is the attempted murder, the government would present evidence from the victim in this case, who was shot approximately six times.   We would present his testimony regarding his injuries.   We would also present testimony of other individuals who were involved with [the defendant] in the

conspiracy to commit the—well, it was a conspiracy to commit a homicide, and that the purpose of the homicide, according to the cooperating witnesses, was that this individual had provided information about a drug sale that [the defendant] made on November 27, 2007, and that the purpose was to kill him because he had basically ratted [the defendant] out.

*Id.* at 55.   The Court inquired if the defendant disagreed with anything the government said he had done.   *Id.*   The defendant replied, "No, I do not."   *Id*.

When asked by the Court to describe what made him guilty of Count One of the Information, Gjuraj volunteered only limited information: "I drove a car knowing that there was going to be a robbery taking place."   Change of Plea Tr. [Dkt. #731] at 51.   Under further questioning by the Court, the defendant claimed that "other people in the car were going to rob somebody," they were going to use "a gun," and "they were going to threaten the person that if they didn't turn over whatever they turned over, they were going to shoot them."   *Id.* at 51-52.

### C.   The Sentencing Hearing

Sentencing was held on August 5, 2009 before Judge Kravitz.   The Government sought a 30-year sentence, while the defendant asked for 19 or 20 years.

Neither party objected to the PSR's factual statements or the guideline analysis and calculations (resulting in a total offense level of 41 and range of 324 to 405 months), which the Court adopted.   Sentencing Tr. (attached as Exhibit 1) at 5-6, 9-12.

The Court heard extensive presentations from the parties.   Victim-1 (whom Gjuraj had sought to have murdered) addressed the Court; Victim-2 (whom Gjuraj had robbed) was afraid to appear.   *Id.* at 18-22.   Before hearing from the defense, the Court alerted the parties to certain issues of concern:

I think here, three things stand out to me, not in any, necessarily, order:

One is attempting to kill somebody who was cooperating with the

government, I mean, that is a big deal and thank God, Mr. Baldwin was not killed, but the intent was to kill him, okay? That's a rather substantial crime. Actually if we just took that crime and put away the drugs, the sentence would be quite substantial, just for that crime in and of itself, and all that goes with it in terms of the Court wanting people to cooperate and needing people to cooperate. So that's one.

Secondly, the size of the operation here. I mean, I spent a large portion of my time dealing with, including in this case, dealing with street level people who are addicted to drugs and who sell drugs in order to feed their addiction habit and don't make any money, none whatsoever, who live destitute lives, and very tragic lives, and they often face, because they've done this a long time, because of their addiction, very lengthy sentences for, you know, small amounts of drugs.

Here, we have kilograms, kilograms of drugs, and really the central leader of this operation, and that concerns me a lot. Sometimes I don't get to sentence those individuals at the level I would like to sentence because often they cooperate and roll up the whole organization. That's not the case here, and that concerns me.

Third, you have no criminal record. I mean, you are jumping from zero time in prison to large amounts of prison, no matter what sentence I impose, and that's a concern, too, because ordinarily we like to see, from a deterrence point of view, someone getting increasing amounts of prison time as a way to bring home to them that it's the wrong way to live one's life. You are jumping from zero to a huge number, and I understand that, and that is a concern as well.

There are other issues of your health and your family upbringing and the like, those are always important, but these three things stand out to me as factors that move around in terms of where things stack up.

Id. at 27-28.   After responsive comment by defense counsel, the defendant and six other individuals spoke on Gjuraj's behalf.

Prior to imposing sentence, the Court explained the principles that governed the sentence it would impose on the defendant, including the factors set forth in 18 U.S.C. § 3553(a).   *Id.* at 7-8.   Judge Kravitz then imposed a slightly below-Guidelines sentence of 320 months of imprisonment and 5 years of supervised release on each of Counts Two and Four, to run

concurrently with a 240-month sentence on Count One of the Information.[2]   In the Judgment

concerning Counts Two and Four, Judge Kravitz explained his sentencing rationale as follows:

> Taking into consideration all of the facts and factors—including, among other things, the disparity between crack and cocaine powder, the Defendant's upbringing and family circumstances, his health, the nature of the offenses that he committed, the nature of his drug organization and his lack of any substantial criminal record—the Court determined that a sentence of 320 months was sufficient but not greater than necessary to serve all of the purposes of a criminal sentence.   In particular, the Court found that providing just punishment, promoting respect for the law and protecting the public warranted a sentence of 320 months, given that the Defendant ordered a federal cooperator to be murdered, engaged in a violent robbery of a 60-year-old woman, and ran a very large cocaine trafficking organization that also trafficked in firearms and that stored drugs in various locations including a wall near school grounds.

Judgment [Dkt. #753] at 1.[3]

## D.      Pending Matters

On December 27, 2019, in response to Gjuraj's motion for a reduced sentence under the

First Step Act, the Court held that—with respect to Counts Two and Four of the Second

Superseding Indictment—"Gjuraj is eligible for relief under the First Step Act and, although it has

not determined, at this time, to lower Gjuraj's sentence, will hold a plenary resentencing hearing."

Ruling [Dkt. #1137] at 1; Jan. 5, 2021 Order [Dkt. #1186].   On March 12, 2020, at the defendant's

request [Dkt. #1142], his resentencing was continued indefinitely [Dkt. #1143].

On December 18, 2020, Gjuraj filed his § 3582 Motion, seeking a sentence reduction on

---

[2]  As the Court has recognized [Dkt. #1137 at 5-6], Judge Kravitz erred in imposing sentence on Count Two in excess of the statutory maximum.   The parties had erroneously stipulated to a statutory maximum sentence of 360 months in their plea agreement; in fact, the statutory maximum was not increased from 240 months until the month after Gjuraj committed his offense.

[3]  A separate Judgment concerning the Hobbs Act robbery was entered in 3:08-cr-233, principally sentencing Gjuraj "to be imprisoned for a total of 240 months on Count One to run concurrently with the sentence imposed with case 3:07cr289 (MRK)."   *United States v. Gjuraj*, Case No. 3:08-cr-233 (MRK), Dkt. #20 at 1.

all his counts of conviction.    Def's Mot. [Dkt. 1179].

At the defendant's request, the Court scheduled a simultaneous resentencing and hearing on that motion for February 2, 2021.    Minute Entry [Dkt. #1188].

## II.    FACTUAL BACKGROUND

The following is based on the Presentence Report, the parties' sentencing memoranda, wiretap interceptions, and the sentencing transcript.

### A.    Gjuraj's Early Drug Dealing

By Gjuraj's own admission, he began selling cocaine in at least 1998.    According to him, between 1998 and 2006, he "did okay" as a "low profile, relatively small drug dealer."    Def's Sentencing Mem. [Dkt. #694] at 7.    Gjuraj explained that he would purchase 100 grams of cocaine at a time for $2,400 and break it down into one-gram quantities, which he then sold for $50 or $60 a piece over "a couple of weeks," a practice he continued for the next eight years.    *Id.* at 7, 9.

Assuming Gjuraj accurately reported the quantity and prices of narcotics he sold, in one year, he would have sold 2.6 kilograms of cocaine at a profit of between $67,600 and $93,600 a year, tax-free.    Over eight years, therefore, Gjuraj sold approximately 20.8 kilograms of cocaine at a profit of between $540,800 and $748,000.

### B.    The Gjuraj Organization

In 2006, Gjuraj saw an opportunity to capitalize on the "major [cocaine] drought" and increased his narcotic trafficking activities.    *Id.* at 7.    In his own words, "Cocaine was hard to get, people I never dealt with in my life was coming up to me asking do I know where to get some. My luck I did, the people I was getting from had it and kept having cocaine at least once a week." *Id.* at 8.    Rather than limit himself solely to the sale of powder cocaine, Gjuraj also took this opportunity to learn how to cook powder cocaine into crack because he "found out you can get a

lot more grams when you cooked it up. …After paying and watching a couple of times I pretty much taught myself how to do it not as good as my supplier but good enough so I can make a profit." *Id.* at 8. *See also id.* at 5 (Gjuraj: "you can turn 100 grams of cocaine into 200 grams of cocaine base when you cook it").

By early 2007, the defendant had also greatly increased the quantity of cocaine that he was purchasing for redistribution, and continued to operate a high-volume narcotics trafficking organization for the duration of the conspiracy.

### C.     The Gjuraj Investigation

In December 2006, the Federal Bureau of Investigation ("FBI") and the Norwalk Police Department began an investigation to address myriad complaints from residents of Norwalk's Washington Village Housing Complex regarding rampant narcotics trafficking in the area.

A large number of individuals were selling crack cocaine in and around the Washington Village and Roodner Court Housing Complexes, on the street corners, in the playgrounds, and from their apartments.   Specifically, both Washington Village and Roodner Court contained open air drug markets where individuals seeking to buy narcotics could simply drive up to locations around the Housing Complexes and wait to be approached by someone in possession of crack cocaine for sale.   The dealer would then provide the buyer with a cell phone number to use to set up future drug transactions.   One could stand on the corner of Raymond Street in Norwalk and watch the procession of cars traveling into and out of Washington Village.

As the investigation progressed, surveillance, cooperating witness information, and undercover narcotics purchases revealed that many of the narcotics sellers were members of, or affiliated with, a group called the Goonies, also known as the Washington Village Bloods ("WV Bloods").   From their inception in 2000, the WV Bloods had been one of the major drug trafficking organizations in Norwalk, supplying cocaine and crack cocaine at both the street and

wholesale levels throughout the city.

In order to stem the tide of narcotics flowing into Washington Village, the FBI conducted a number of undercover and controlled purchases in an effort to determine the primary source of narcotics supply.   Initially, the undercover officers made small quantity, street-level purchases of crack cocaine from WV Bloods, including Travis Simms, Joe Young, Trayson Stevens, and others. The investigation rapidly advanced, and law enforcement officers were able to make several controlled purchases of crack cocaine in quantities of 28, 64, and 125 grams.

In particular, on September 4, 2007, law enforcement used a cooperating witness ("CW-1") to arrange to make a controlled purchase of 125 grams of cocaine base from Trayson Stevens. Stevens told CW-1 that they would meet the supplier in Stamford, and instructed him to bring $4,400 to pay for the narcotics.   Law enforcement officers surveilled CW-1 and Stevens as they drove from Norwalk to a parking lot in Stamford.   Minutes after Stevens and CW-1 pulled into the parking lot, the defendant arrived driving a green Toyota Camry registered to Arbnor Gjini (the defendant's cousin) and Gjini arrived driving a black BMW Model 745 registered to Diana Gjuraj (the defendant's sister).   Stevens got out of the car and met briefly with the defendant inside the Toyota, then returned to CW-1's car and gave him 123 grams of crack cocaine that he had obtained from Gjuraj in exchange for $4,400.

Following the transaction, law enforcement surveillance units followed Gjuraj and Gjini, who were driving the Toyota and the BMW, respectively.   Both Gjuraj and Gjini engaged in several counter-surveillance techniques designed to detect the presence of law enforcement. Both vehicles eventually arrived at 83 Palmer Street in Stamford, Gjuraj's residence.   Law enforcement officers then observed Gjuraj get out of the Toyota carrying a bag, which he secreted under the front seat of a gray Honda Accord that was also parked in front of his residence.

On November 14, 2007, the FBI received authorization to conduct a Title III wiretap investigation on Stevens's cellular telephone. Based on the interceptions, it soon became apparent that the WV Bloods' main sources of supply for both crack and powder cocaine were Gjuraj and Gjini. Interception of the wire communications also made it clear that Richard Davis was Gjuraj's main "lieutenant" in the drug trade and, as such, was the primary means through which Gjuraj and Gjini distributed narcotics to Norwalk dealers.

The investigators determined that Gjuraj, Gjini, Davis, and others would regularly travel to New York to purchase multi-kilogram quantities of cocaine. According to another cooperating witness ("CW-2"), he would accompany Gjuraj and Gjini to New York one or two times a week. During each trip, Gjuraj and Gjini would purchase between one and three kilograms of cocaine from their source of supply.[4] Gjuraj would convert the great majority of the powder cocaine into crack cocaine prior to distributing it; the remainder would be sold in powder form. According to CW-2, Gjuraj primarily sold narcotics to dealers operating in Stamford and Norwalk, although Gjini had some cocaine and heroin customers in Greenwich, as well.

CW-2's information, particularly concerning narcotics quantities, was highly corroborated by the volume of sales evidenced by wire interceptions, seizures, controlled purchases, other cooperating witnesses, and Gjuraj's own admissions. For example, on January 10, 2008, Davis was contacted by Lavaughn Brown with a request to purchase a kilogram of crack cocaine. Davis immediately called Gjuraj to set up the deal. The wire intercept made clear that Davis neither had access to such a large quantity of narcotics, nor had control over the price that would be

---

[4] Using these figures over a year, Gjuraj and his organization trafficked between 56 kilograms (*i.e.*, one trip per week, one kilogram per trip) and 336 kilograms (*i.e.*, two trips per week, three kilograms per trip). Without objection by Gjuraj, the PSR used the lower figures to "conservatively estimate[] that the offense involved 56 kilograms of cocaine base." PSR ¶ 27. Judge Kravitz adopted this factual statement. Sentencing Tr. at 5-6.

demanded for the drugs; rather, Gjuraj supplied the narcotics and set the price he deemed appropriate.   On this particular occasion, Gjuraj advised Davis that he would provide 400 grams of crack cocaine and directed Davis to charge $15,000, of which Davis could keep $1,000. Within 90 minutes of Davis's initial call, Gjuraj had supplied him with the narcotics, which Davis then drove in Gjuraj's Jeep Grand Cherokee to conduct the deal.

Gjuraj would hide crack cocaine at various locations throughout Stamford, and elsewhere. For instance, on January 17, 2008, the Government learned from CW-2 that Gjuraj and Gjini regularly hid large quantities of crack cocaine in a stone wall that bordered the playground and playing field of the elementary school at King School in Stamford.   Based on that information, on January 18, 2008, law enforcement officers conducted a search of the stone wall utilizing a trained narcotics detection dog and discovered 300 grams of crack cocaine hidden behind a loose stone in the wall on the school property.

CW-2 also informed the government that Gjuraj and Gjini stored narcotics in secret compartments or "traps" built into each of their cars.   CW-2 stated that Gjuraj had a black BMW 745, a Jeep Grand Cherokee, and a silver Acura, and that Gjini had a green Toyota Camry.   CW-2 stated that Gjuraj usually drove the BMW, Gjini usually drove the Acura, and that the Toyota Camry was regularly utilized as a stash location for narcotics.   CW-2 advised officers that the Camry was located in a parking lot in Portchester, New York, near the apartment of one of Gjuraj's girlfriends, and that as recently as three days prior, he had seen crack cocaine, powder cocaine, money, and a gun in the Camry's trap.

Based on that information, on January 17, 2008, law enforcement officers located Gjini's Camry in the Portchester parking lot described by CW-2, seized, and searched it.   In a secret compartment built into the car's center console, officers discovered 600 grams of powder cocaine,

over 800 grams of crack cocaine, a small quantity of heroin, two scales used to weigh narcotics, cutting agents used to dilute narcotics, $3,000 in cash, and a fully loaded handgun. Documentation recovered from the vehicle, the factual basis provided by Gjini during his guilty plea, and fact that the key to the Camry was recovered from Gjuraj's later-seized BMW all support the conclusion that the narcotics were possessed by both Gjini and Gjuraj in furtherance of the narcotics conspiracy to which Gjuraj pled guilty.   Furthermore, as described in detail in the Presentence Report, law enforcement officers thereafter recovered the BMW 745, Acura, and Jeep Grand Cherokee, which Gjuraj eventually acknowledged belonged to him.   Each of those cars were similarly found to be fitted with after-market "traps," the sole purpose of which was to conceal narcotics and weapons.

### D.    Gjuraj's Attempted Murder of a Federal Witness

On November 27, 2007, Victim-1, who is referred to in the Second Superseding Indictment as "John Doe," was arrested in possession of 80 grams of crack cocaine.   Immediately following his arrest, Victim-1 stated that he wanted to cooperate with law enforcement and explained that he could call his supplier, who he knew only as "Ease," and order a large quantity of crack cocaine.

At the direction of law enforcement, Victim-1 contacted "Ease" and requested to purchase 125 grams of crack cocaine.   Victim-1 and "Ease" arranged to meet that day at a location in Stamford to conduct the transaction.   Law enforcement officers in the vicinity then observed Gjuraj, also known as "Ease," arrive at the meet location driving his Jeep Grand Cherokee.   When Gjuraj was placed under arrest, he was found to be in possession of 125 grams of crack cocaine, $676 in cash, and ten cellular telephones.   According to cooperating witnesses, Gjuraj also had a kilogram of cocaine hidden in the secret compartment in the center console trap of the Jeep, which went undiscovered because law enforcement was not yet aware of the trap's existence.

Gjuraj was taken into custody and, despite the large quantity of narcotics seized, was able

to post bond within hours.    Upon his release, Gjuraj went directly to Davis's home and told Davis that he wanted to kill Victim-1 because Victim-1 had "set him up."    Gjuraj asked Davis to either kill Victim-1 himself or to find someone who would do so.

Davis then arranged a meeting between Gjuraj and co-defendant Antonio Robinson (who had previously dated one of Gjuraj's sisters for several years).    Gjuraj advised Robinson that Victim-1 had set him up to be arrested and told Robinson that he would pay him $1,000 and 100 grams of crack cocaine to kill Victim-1.    Gjuraj gave Robinson 50 grams of crack and stated that he would give Robinson the remainder of the drugs and the money after Victim-1's murder.

During the course of their planning, Gjuraj provided Robinson with a .32 caliber gun to commit the homicide.    However, on December 24, 2007, Davis called Tony DeJesus and arranged to borrow a larger caliber weapon.    Davis explained to DeJesus that Victim-1 had set Gjuraj up to be arrested and that, as a result, Gjuraj had "caught a case" (*i.e.*, been charged). Davis explained to DeJesus that Gjuraj wanted Victim-1 "to be handled," but that they need a larger caliber gun.    DeJesus agreed to provide Davis with a .38 revolver.

Davis and Robinson drove to DeJesus' residence to retrieve the gun, then drove to Victim-1's residence.    Robinson called Victim-1 and pretended to be interested in purchasing a car that Victim-1 had for sale in order to lure him outside.    When Victim-1 came downstairs, Robinson shot him six times at close range in the chest, arm, and hand.    The shooting was witnessed by Victim-1's 14-year-old daughter.    After the shooting, Robinson escaped in the car driven by Davis.    Victim-1, although severely injured, survived the shooting.

Within days of the attempted murder, Gjuraj, Davis, and Robinson discovered that Victim-1 had not succumbed to his injuries.    They therefore continued in their quest to kill Victim-1. Fortunately, the FBI intercepted the calls relating to Gjuraj's efforts and interceded, first taking

Victim-1 into protective custody, then moving him out-of-state.   Although Robinson failed to murder Victim-1, Gjuraj nonetheless paid him for the "work" he had done.

Victim-1 eventually underwent two surgeries, leaving him permanently disfigured, with a metal plate and fifteen screws, nerve damage, constant pain, and psychological effects.   PSR ¶ 30. By the time of sentencing, the victim's teenage daughter—another victim—also had not recovered from witnessing the attack, and their relationship had suffered as a result.   *Id.*

### E.   Gjuraj's Other Attempted Murders

In late January 2008, Gjuraj arranged for Robinson to execute an individual who Gjuraj erroneously believed had "snitched" on Davis.   Gjuraj also hired Robinson to kill two people who Gjuraj believed had knowledge of his, Robinson's, and Davis's involvement in the attempted murder of Victim-1.   As with Victim-1, Gjuraj promised to pay Robinson $1,000 and 100 grams of crack cocaine for each murder.   Although Robinson, Gjuraj, and others surveilled each of their three intended targets, and even took affirmative steps toward the murder of one of them, happily, none were harmed.

### F.   Gjuraj's Gun Trafficking

In addition to narcotics trafficking and acts of violence, the defendant also purchased and attempted to purchase several firearms during the course of his conspiracy.

For instance, in early January 2008, DeJesus sold a P89 semi-automatic pistol with an extended magazine to Gjuraj in exchange for an ounce of crack cocaine.   While DeJesus arranged the transaction through Davis, he was advised by Davis that Gjuraj was paying for and was the intended recipient of the weapon.   Moreover, the fact that Gjuraj was the actual purchaser of the weapon was corroborated by wiretap interceptions.   Specifically, on January 2, 2008, Davis called Gjuraj and told him that DeJesus had a P89 semi-automatic handgun for sale with a 25-round capacity.   Gjuraj directed Davis to pay DeJesus an ounce of crack cocaine for the gun,

which Davis did and delivered the gun to Gjuraj.   The following day, Gjuraj called Davis and told him that he wanted to go to Walmart to purchase ammunition for the gun so that they could "go have fun with it."

DeJesus also arranged to sell Davis four guns in mid-January 2008, all of which were destined for Gjuraj.   One of the weapons is believed to be the .38 revolver used in the attempted murder of Victim-1.   According to the cooperating witnesses, Gjuraj wanted to buy the gun from DeJesus because he feared the gun may otherwise end up in the hands of law enforcement.   The gun transaction was never completed because the FBI, who had intercepted the calls between DeJesus and Davis discussing the sale of the weapons, arrested Davis first.

In addition, in late January 2008, Gjuraj gave Robinson two weapons and a bulletproof vest, and directed a third-party to deliver a third gun and a second bulletproof vest to him, for use in the planned execution of the individual Gjuraj erroneously believed had "snitched" on Davis, discussed above.   After Gjuraj's arrest, Robinson sold two of Gjuraj's weapons and then arranged for the disposal of the remaining gun and the bulletproof vests.

### G.      Gjuraj's Hobbs Act Robbery

On February 16, 2005, Gjuraj and his brother-in-law, Fatmir Nezaj, drove to New Jersey armed with a gun with the intention of committing a robbery.   Once they arrived in Paramus, the defendant and his co-conspirator followed Victim-2—a 60-year old woman—home from a grocery store and robbed her of her jewelry.

According to Victim-2, she was carrying her groceries from her car to her home when she saw was approached by a man in dark clothes and a dark hat.   PSR ¶ 29; Attachment to Gov't Sentencing Mem. (Bergen County Prosecutor's Office Report of Investigation) [Dkt. #735-2] at 3-4.   Victim-2 later identified this man as Gjuraj in a photographic lineup.   *Id.* at 5-6.   As Victim-2 described it, "I went inside and tried to close the door, he kicked down the door, came

in, pulled out the gun and robbed me." *Id.* at 4.   Gjuraj threatened the victim with a handgun, saying, "[g]ive me your jewelry or I will shoot you." PSR ¶ 29.   At Gjuraj's insistence, Victim-2 removed her watch and necklace; Gjuraj forcibly removed her ring.   *Id.*   Gjuraj instructed Victim-2, "get down on the floor," and fled.   PSR ¶¶ 29-31.[5]   Gjuraj then fled with Victim-2's jewelry, drove to the Diamond District in New York City, and hocked the stolen property, which was worth approximately $150.   PSR ¶ 31.

Even years later, the victim described the defendant's assault on her as a "life-changing experience," and stated that her "whole world has been changed."   PSR ¶ 31.   In describing the robbery to Probation, she stated, it "happened very fast, she feared for her life, and it was the worst thing that has ever happened to her."   *Id.*   "The victim was left unable to go "out at night, or by herself anymore," and had difficulty sleeping.   *Id.*

## III.   ARGUMENT

### A.   Legal Standard

With respect to the plenary resentencing on Counts Two and Four of the Second Superseding Indictment, the Court should proceed under Federal Rule of Criminal Procedure 32 and 18 U.S.C. § 3553.[6]

With respect to his § 3582 Motion, as the movant, Gjuraj bears the burden of establishing that he is eligible for a sentence reduction.   *United States v. Ebbers*, 432 F.Supp.3d 421, 426 (S.D.N.Y. 2020); see also *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States*

---

[5] Victim-2's version of events contrasts with Gjuraj's statements under oath at his change of plea hearing, in which he minimized his involvement in the robbery, claiming that the extent of his participation was "I drove a car knowing that there was going to be a robbery taking place." Change of Plea Tr. [Dkt. #731] at 51.

[6] Although the Court has the benefit of the original PSR and its various supplements [Dkt. #966, 969, 1113, and 1116], the Government suggests the Court make an additional finding under Rule 32(c)(1)(A)(ii) that "the information in the record enables it to meaningfully exercise its sentencing authority under 18 U.S.C. § 3553."

*v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).   Under the relevant terms of the statute, "the court may not modify a term of imprisonment once it has been imposed except that…after considering the factors set forth in section 3553(a)…if it finds that extraordinary and compelling reasons warrant such a reduction."   § 3582(c)(1)(A)(i); *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020).   "The only statutory limit on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation…alone shall not be considered an extraordinary and compelling reason.'"   *Brooker*, 976 F.3d at 237-38 (quoting 28 U.S.C. § 994(t)); *see also United States v. McCarthy*, 453 F. Supp. 3d 520, 526 (D. Conn. 2020) (same).   Even where extraordinary and compelling reasons exist, a court may deny compassionate release denied based solely on the § 3553(a) factors.   *See, e.g.*, *United States v. Hart*, No. 15 CR. 288 (RMB), 2021 WL 82281, at *4 (S.D.N.Y. Jan. 10, 2021) (assuming extraordinary and compelling circumstances, § 3582 motion denied "because, among other things, (i) Hart poses a danger to the community; and (ii) the 18 U.S.C. § 3553(a) sentencing factors weigh against Hart's release."); *United States v. Webster*, No. 3:91CR138 (DJN), 2020 WL 618828, at *6-8 (E.D. Va. Feb. 10, 2020) (denying compassionate release to defendant with terminal cancer even though court found extraordinary and compelling reasons because § 3553(a) factors weighed strongly against relief); *United States v. O'Garro*, No. 3:14CR227 (AWT), 2020 WL 3086028, at *4 (D. Conn. Jun. 10, 2020) ("But the court concludes that resolving that question [regarding whether the defendant's health makes him particularly susceptible to COVID complications] is not necessary because the defendant has not met his burden of demonstrating that, after considering the factors set forth in § 3553(a) to the extent they are applicable, there are compelling reasons that warrant a sentence reduction in his case.").   In conducting the § 3582 analysis, a court's "task is not to second guess or to reconsider whether the original sentence was just, but to assess whether the defendant's circumstances are so

changed that it would be inequitable to continue the confinement of the prisoner."   *United States v. Anton*, 3:17CR263 (MPS), 2020 WL 3430187, at *3 (D. Conn. June 23, 2020) (quoting *Ebbers*, 432 F. Supp. 3d at 429-30) (alterations and quotation marks omitted)).

### B.   The § 3553(a) Factors Weigh Against Reducing Gjuraj's Sentence

This Court should leave Gjuraj's sentence undisturbed.   The 18 U.S.C. § 3553 factors— which govern both Gjuraj's resentencing under the First Step Act and his § 3582 motion—still strongly support the 320-month sentence imposed by Judge Kravitz after thoughtful analysis. While that is surely a lengthy sentence, it fits well the serious nature of the defendant's many crimes.   The Court should reserve its compassion for the victims who were forever scarred by the defendant's callous behavior and the lives torn apart by the many kilograms of drugs he trafficked.[7]

### 1.   The Nature and Circumstances, and Seriousness, of the Offenses

Gjuraj was a long-time crack dealer who eventually became the senior managing partner of a large crack cocaine trafficking conspiracy that directly endangered children and dealt guns; he engineered a plot to murder a Government witness against him, and put in motion plans to execute three other people he believed to be cooperating with law enforcement; and he attacked and robbed an elderly woman at gunpoint.

Gjuraj's first and most notable count of conviction (Count Two of the Second Superseding Indictment) was for his leadership of a conspiracy to murder a Government cooperator who had assisted in the defendant's arrest.   The defendant paid 100 grams of crack cocaine and $1,000 in cash for the hit, and provided practical support by participating in the planning and supplying a

---

[7] Although Gjuraj's facility (FCI Loretto) currently has only one inmate case and 16 staff cases of COVID-19, https://www.bop.gov/coronavirus/ (last visited Jan. 22, 2021), his obesity, heart condition, and asthma actually or potentially place him at an increased risk of severe illness .   The Government therefore assumes that he is likely to satisfy the extraordinary and compelling reasons prong of the § 3582 analysis.

.32 caliber pistol.   PSR ¶ 16.   At the defendant's instigation and direction, the would-be hitman shot the Government witness six times at close range, while the victim's 14-year old daughter looked on.   PSR ¶¶ 16, 30.   Even after Victim-1 was released from the hospital, Gjuraj continued to take steps to have him murdered.   This crime was consistent with Gjuraj's approach to people who he believed were working with law enforcement, as he similarly sought to murder three other suspected cooperators.   Eventually, Victim-1 underwent two surgeries, leaving him permanently disfigured, in constant pain, and psychological damage; his relationship with his teenage daughter was also affected, and she had not recovered more than a year later.   PSR ¶ 30.

Gjuraj's murder-for-hire plot did not occur in a vacuum, but was a direct result of his second count of conviction (Count Four of the Second Superseding Indictment), for his leadership of a crack cocaine trafficking conspiracy.   After a decade as a successful drug salesman, Gjuraj rose to become "a prolific supplier of cocaine base in Fairfield County."   PSR ¶ 99.   "Gjuraj was a leader of the operation" with "supervisory authority" superior to that of his "partner."   PSR ¶ 27.   The defendant's enterprise was proficient and dangerous; Probation "conservatively estimated that the offense involved 56 kilograms of cocaine base" over a 56-week period.   *Id.* Of particular significance, Gjuraj "would hide large quantities of crack cocaine within a rock wall that surrounded a school yard in Stamford," where the police eventually found 300 grams of crack. PSR ¶ 22.   Moreover, the defendant and his organization also attempted to kill four suspected informants and trafficked firearms, including the one that Gjuraj hoped would be used to kill Victim-1.   Judge Kravitz pointed out how Gjuraj's related crimes compounded his culpability, saying, "[D]rugs are bad enough.   Guns and drugs are ten times worse, more than ten times worse. And your client appears to have been trafficking in guns as well, A; and B, it appears that the attempted murder on this victim might not have been the only one.   And that's disturbing."

Sentencing Tr. at 35.

Finally, Gjuraj's third count of conviction showed him to be willing to use personal violence (Count One of an Information, charging Hobbs Act Robbery).   Before becoming the leader of his own trafficking operation, Gjuraj "robbed [] an elderly female victim of her jewelry at gunpoint."   PSR ¶ 100.   Specifically, the defendant kicked in a 60-year old woman's door, threatened her with a gun, made her lie on the floor, and forcibly removed her jewelry.   His haul was worth $150.

Judge Kravitz had the entirety of Gjuraj's criminal conduct before him at sentencing, and described it thusly:

> This is a horrendous set of crimes. Paying somebody to murder somebody else who had the temerity to get you arrested and cooperate with the federal government is beyond not acceptable behavior.   It is behavior that we should punish, and we should punish severely so that others don't do the same thing.

> Secondly, this drug operation is a massive drug operation which was fuelled by your desire for just greed.   Just greed.   And the aspects of it that we've been talking about show I think a recklessness on your part, which is not excusable.   I mean, storing drugs on the school playground, hiring people to murder others, dealing in firearms, dealing in multiple kilograms of cocaine every day, and then kicking the door down of a 60-year-old woman and threatening to shoot her if she doesn't give you her ring.   This kind of behavior, I've not seen before, frankly, in the cases before me.

> So that your family members just know, while I appreciate your comments, we are dealing with a scale of conduct here that is really off the scale from the kind of cases I typically see.   Dealing drugs since 1998, over ten years.

> Drug crimes, I take very seriously because they are not victimless crimes.   If the drugs hurt the person who took the drugs, it would be bad enough but drugs don't, they destroy families -- and you know that firsthand now – and they destroy whole communities. And this area of Norwalk was victimized by you and your organization, and I take that very seriously.

> So those are all really bad things.

*     *     *

> But the scale of this drug operation and the really heartlessness of
> your willingness to murder people who crossed you strikes the Court
> as enormously serious and needs a punishment that reflects the
> seriousness of that conduct.

Sentencing Tr. at 99-101.   Faced with the nature and circumstances of the crimes, Judge Kravitz ruled that 320 months in prison was sufficient but not greater than necessary to reflect the seriousness of Gjuraj's offenses.   Judge Kravitz was right, and the Court should find the same.

## 2.   History and Characteristics of the Defendant

In 2009, Gjuraj presented himself as the product of poverty, parental abuse and neglect, marijuana and alcohol abuse, a gambling addiction, physical ailments (including allergies, chronic pain, and car accident injuries), depression, anxiety, and panic attacks.   Def's Sentencing Mem. at 20-22, 32, 37-39.   Gjuraj further described his relationship with his family, especially his young son and his fiancé (who spoke at his sentencing, Sentencing Tr. at 65-66).   Def's Sentencing Mem. at 33-36.   Judge Kravitz took all that into account in reaching his sentencing decision.   *See, e.g.*, Sentencing Tr. at 100-101.

Since he was sentenced, Gjuraj has been subject to constant institutional supervision, making it difficult to assess his recent history or how well his behavior while incarcerated predicts his behavior if released.   On the one hand, as he states, he "has taken numerous BOP programs and has had only two minor disciplinary incidents."   Def's First Step Act Mem. [Dkt. # 1121] at 5.   On the other hand, he deserves little credit for doing "what was plainly required of him—that is, behaving himself in prison," and had he done otherwise, "his continued disrespect of the rules would suggest a greater need to protect the public from further crimes."   *United States v. Mumuni*, 946 F.3d 97, 112 (2d Cir. 2019).

In any event, there is little reason to believe that continued incarceration poses a particular

risk to Gjuraj's health or well-being.   As his medical records attest, he receives care for his existing medical issues.   As for the COVID-19 pandemic, although Gjuraj has preexisting conditions that actually or potentially put him at increased risk of severe illness, there is currently only one active inmate case at FCI Loretto.   Moreover, BOP has begun administering vaccine to prison staff and inmates at 68 correctional facilities, and Gjuraj's comorbidities make him eligible for vaccination in the Priority Level 2 group.   BOP Press Release: "Update on COVID-19 Vaccinations", *available at* https://www.bop.gov/resources/news/pdfs/20210115_ press_release_ vaccination.pdf; COVID-19 Vaccine Guidance, *available at* https://www.bop.gov/resources/ pdfs/ 2021_covid19_vaccine.pdf.

Given the lack of a material change in Gjuraj's history and characteristics since Judge Kravitz imposed sentence, this factor does not suggest a resentencing or reduction is appropriate.

### 3.   Deterrence

While all of Gjuraj's crimes are condemnable, his willingness to murder a Government witness and informants should be met with the most severe punishment to dissuade others from similar attempts.

Retaliation against those who seek to cooperate with law enforcement coerces individuals from providing information, prevents victims from exercising their right to be heard, and stops the Government from investigating cases.   For these reasons, the potential punishment must be so severe that a defendant facing significant time in prison is not even tempted to consider whether an inconvenient witness could be scared or killed.   *United States v. Cavera*, 550 F.3d 180, 196 (2d Cir. 2008) ("Where the profits to be made from violating a law are higher, the penalty needs to be correspondingly higher to achieve the same amount of deterrence.").

The case against Gjuraj was made by cooperators.   While Gjuraj's attempt to silence Victim-1 failed—notwithstanding his best efforts—he did succeed in scaring Victim-2 from

speaking at his sentencing.   Gjuraj's willingness to plot the murder of four people he believed were working with law enforcement demonstrates exactly the skewed cost-benefit analysis that criminals will undertake if not otherwise deterred.

Judge Kravitz indicated in his comments at sentencing that he was seeking to achieve general deterrence with Gjuraj's sentence:   "Paying somebody to murder somebody else who had the temerity to get you arrested and cooperate with the federal government is beyond not acceptable behavior.   It is behavior that we should punish, and we should punish severely so that others don't do the same thing."   Sentencing Tr. at 101.   Gjuraj's 320-month sentence sent a strong deterrent message, which this Court should reaffirm.

### 4.    Protection of the Public

When not in custody, Gjuraj has shown himself to pose a persistent and intolerable danger to the public.   Gjuraj showed himself willing to place others in danger for his own benefit; he distributed narcotics throughout Fairfield County, trafficked in guns, and stored his poison in a school wall.   Gjuraj also showed himself to be willing to kill for revenge; while on bond, Gjuraj conspired to have Victim-1 shot as punishment for cooperating with the Government (and three other suspected informants likewise murdered), then sent his co-conspirators to complete the murder when Victim-1 survived.   Gjuraj also showed himself willing to physically hurt people to get what he wants; aside from his readiness to kill troublesome witnesses, he terrorized a 60-year-old woman with a gun for $150 worth of jewelry.

Considering all this, Judge Kravitz told Gjuraj that his conduct "show[ed] I think a recklessness on your part, which is not excusable."   Sentencing Tr. at 99.   Although years have passed, Gjuraj is not entitled to the benefit of the doubt at the expense of others' safety.   Given the inexcusable risk he has repeatedly shown himself to pose to the safety of the community, this factor weighs heavily in favor of Gjuraj's continued incarceration for his full 320-month sentence.

### 5.      Sentencing Guidelines

The applicable Guidelines calculations—to which Gjuraj stipulated in his plea agreement and at sentencing—have not changed, and his range remains 324 to 405 months.   First Step Act Addendum to PSR [Dkt. #1113] at 4-5.   Thus, 320 months remains a slightly below-Guidelines sentence.

Gjuraj urges the Court to apply the Guideline as if the defendant had trafficked powder cocaine, reducing the Guidelines range to 235 to 293 months.   Def's Mem. at 29.   Judge Kravitz considered that proposal, making clear that he had considered "the disparity between crack and cocaine powder" in reaching a 320-month sentence.   Judgment [Dkt. #753] at 1.   Even if the Court were to afford Judge Kravitz's determination no deference, the significant aggravating circumstances here distinguish this from cases in which a one-to-one ratio is necessary to avoid a disproportionate result.   Indeed, even if the Court used the defendant's revised Guidelines calculation, 320 months is only a 27-month above-Guidelines sentence, an upward variance which is appropriate given the defendant's witness retaliation and other violent acts, firearms trafficking, and willingness to endanger children.

Gjuraj also suggests that his Guidelines range might be even further reduced because the drug quantity is uncertain, possibly even as little as 4.5 kilograms, resulting in a Guidelines range of 210 to 262 months.   Def's First Step Act Mem. at 29-30.   This argument asks the Court to ignore the unambiguous facts and prior rulings.   The PSR—to which the defendant offered "only minor corrections" and called "otherwise thorough" (Def's Sentencing Mem. [Dkt. #694] at 2)— "conservatively estimated that the offense involved 56 kilograms of cocaine base" over a 56-week period.   PSR ¶ 27.   The defendant did not object to the resulting 56-kilogram figure either before or during sentencing, but tried to minimize his culpability by portraying himself as a small-time drug-dealer who got in over his head.   Def's Sentencing Mem. at 8-9 ("[A]s a minor drug dealer

for a period from approximately 1998 until 2006, Isni Gjuraj did okay.   As a more serious supplier, he failed miserably.   In fairly short order, he was identified, investigated and prosecuted.").   Judge Kravitz relied on that record in deciding to adopt the PSR's factual findings, including "that the applicable quantity of cocaine base was 56 kilograms."   Sentencing Tr. at 5-6.   Moreover, the Court has already considered and rejected Gjuraj's argument regarding drug quantity.[8]   Order Re: Motion for a Reduction of Sentence, 08-cr-233(JCH) [Dkt. No. 25].   There is no reason why the Court should now ignore the well-established, stipulated, adopted fact that the defendant's relevant conduct involved at least 56 kilograms of crack cocaine.   Indeed, Gjuraj waived the argument by agreeing to the adoption of the factual statements in the PSR.

Moreover, this is not a case where the Guidelines overstate the offense or drove the original sentencing determination.   Indeed, Judge Kravitz noted during the sentencing hearing that—while he did not feel constrained by the Guidelines—the parties' stipulated calculations were arguably too low:

> [I]t is also the case that one could make decent arguments that your guideline ranges should be higher than what they are.   Now, I'm not going to go there, but you didn't get certain additional points that would have pushed them higher and as it is, your guideline range is 324 to 405 months.   405 months.   And while I ordinarily choose the bottom of the range, when I am faced with serious crimes, I go up to the middle or the high end of the range.
>
> So when I said earlier that were [sic] talking about 20 to 30 years, the reality is we are talking about even more. It could be even more.

---

[8] In 2014, the defendant sought a sentence reduction based, in part, on his claim that he had asked his attorney to dispute the PSR's 56-kilogram quantity before sentencing.   Motion for a Reduction of Sentence, [08-cr-233(JCH) Dkt. No. 23], at 9-10.   The only evidence for that claim was an undated, hand-written letter by Gjuraj to his lawyer.   *Id.* (Appx. 4).   On this exact same record, the Court rejected the defendant's request, writing, "On the record at the sentencing hearing, the court (Kravitz, J.) adopted the factual findings in Gjuraj's Presentence Investigation Report.   The court does not now disturb the prior determination to adopt the Presentence Investigation Report's factual findings."   Order Re: Motion for a Reduction of Sentence [08-cr-233(JCH) Dkt. 25].

The government is asking for 30, I know your counsel's asking for 19 and 20.

Frankly I'm not going to choose either of those, but I am going to choose a sentence closer to the government's because I do think that the seriousness of this offense behavior needs to be punished severely.

*Id.* at 102.

Given that Gjuraj stipulated to a generous Guidelines calculation, benefited from a conservative estimate of the drug quantity, and then received a below-Guidelines sentence, this sentencing factor weighs in favor of the 320-month sentence that Judge Kravitz imposed.

## IV.     CONCLUSION

A sentence of 320 months was a just sentence for Gjuraj in 2009, and the § 3553(a) factors show that it continues to be sufficient but not greater than necessary to effectuate the purposes of sentencing.   For all the foregoing reasons, the Court should decline to impose an amended sentence and deny Gjuraj's § 3582 Motion.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY


_____/s/_____
JONATHAN N. FRANCIS
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv05083
jonathan.francis@usdoj.gov
157 Church Street, 25th Floor
New Haven, CT   06510
Tel.: (203) 821-3700

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.   Parties may access this filing through the Court's CM/ECF System.


_____/s/_____
JONATHAN N. FRANCIS
ASSISTANT UNITED STATES ATTORNEY